FILED

04/15/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 5, 2019

**STATE OF TENNESSEE v. ANTERRIO CHAMBERS**

**Appeal from the Criminal Court for Shelby County**
**No. 16-00124        J. Robert Carter, Jr., Judge**

_____

**No. W2018-01423-CCA-R3-CD**

_____

The Defendant, Anterrio Chambers, was convicted of attempted first degree murder, two counts of aggravated assault, reckless endangerment, and employment of a firearm during the commission of or attempt to commit a dangerous felony. He received an effective thirty-one-year sentence. On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions, the trial court's failure to charge misdemeanor reckless endangerment as a lesser-included offense of attempted first degree murder, and the trial court's imposition of partial consecutive sentences. Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Jason M. Matthews (on appeal) and Jennifer Mitchell (at trial), Memphis, Tennessee, for the Appellant, Anterrio Chambers.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Michael McCusker, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

The evidence presented at trial established that during the evening hours of July 15, 2015, the Defendant and two other men fired multiple shots at Mr. Ronald Young and

Mr. Brandon Brown while in the parking lot of Wolfchase Galleria in Shelby County, Tennessee. Ms. Kourtney Kelley, the Defendant's co-defendant, set up the confrontation because she believed Mr. Young had taken money from her during a burglary of her home. The Defendant was charged with attempted first degree murder of Mr. Young, aggravated assault of Mr. Young and Mr. Brown, reckless endangerment of others who were in the parking lot at the time of the shooting, and employment of a firearm during the commission of or attempt to commit a dangerous felony, i.e., attempted first degree murder.

Mr. Young testified that prior to the shooting, Ms. Kelley called him and stated that she wanted to get something to eat, and Mr. Young asked her to meet him at the mall. Although Ms. Kelley stated that she would be at the mall in ten to fifteen minutes, she did not arrive until an hour later. Mr. Young stated that he believed something was wrong because Ms. Kelley was generally punctual. At approximately 6:30 p.m. or 7:00 p.m., Mr. Young met Ms. Kelley by one of the entrances to the mall. Ms. Kelley was sweating and acting nervous and did not make eye contact with Mr. Young. Mr. Young gave Ms. Kelley $10.00 to purchase food, and she walked toward the food court, while Mr. Young and Mr. Brown exited the mall.

As Mr. Young was talking on his cell phone, he saw two men, one of whom was the Defendant, make eye contact with him and Mr. Brown. The Defendant was wearing "highlighter pants, bright yellow, and a colorful T-shirt." Ms. Kelley had previously mentioned the Defendant to Mr. Young, and Mr. Young had viewed a photograph of the Defendant on Ms. Kelley's Facebook page. Mr. Young believed that Ms. Kelley and the Defendant were dating.

The men attempted to cut off the path of Mr. Young and Mr. Brown. Mr. Young ended his call and began walking toward his car. He testified that he saw a gun in the Defendant's pants pocket and that the Defendant was holding up his pants to keep his gun from falling out. The Defendant asked Mr. Young if his name was "Ron" or "Ronnie" and whether Mr. Young had been breaking into houses in Bartlett. Mr. Young said he did not know why the Defendant was asking him such questions. Mr. Young told the Defendant that he had the wrong person. Two other men were with the Defendant and were "[f]ollowing his lead."

Mr. Young testified that he believed his life was in danger and began walking faster to his car. Once Mr. Young and Mr. Brown entered Mr. Young's car, the Defendant approached the driver's side window and said, "[L]et me talk to you real quick." Mr. Young replied, "[N]o, we ain't got nothing to talk about." He started his car, backed out of his parking spot, and drove in reverse in the parking lot while the Defendant and the other men began shooting at Mr. Young and Mr. Brown. The

Defendant continued to chase after the car and shoot at the occupants, and Mr. Young feared for his life. As Mr. Young was driving from the scene, his mother called him and met him at a friend's home. Mr. Young's mother drove him and Mr. Brown back to the mall where they spoke to police officers.

Mr. Young testified that bullets struck the front of his car, the passenger side door, the back panel of the passenger side door, and his two front tires. He had to have the car repainted and the two front tires replaced. Bullet fragments were removed from the car. Two days after the shooting, Mr. Young identified the Defendant and Ms. Kelley in a photographic lineups.

On cross-examination, Mr. Young testified that he had known Ms. Kelley for approximately two months prior to the shooting, that they had met through social media, and that she was not his girlfriend. Mr. Young did not recall obtaining money from Ms. Kelley on the day before the shooting.

Mr. Young stated that when he first saw the Defendant in the parking lot, the Defendant was near Ms. Kelley's car and appeared "kind of angry." The Defendant began walking in between cars and asking Mr. Young questions. The Defendant followed Mr. Young to his car, and one of the men who was with the Defendant stood on the passenger side of the car. Mr. Young did not know the whereabouts of a third man who was with the Defendant. Once Mr. Young started his car, he cracked open his window, and the Defendant said, "Get out the car, I need to talk to you." Mr. Young saw the Defendant holding the gun down by his side.

Mr. Young testified that prior to the shooting, he knew of the Defendant but had never seen him. When officers questioned Mr. Young at the scene, he told them that he did not know the identity of the shooters but that he believed Ms. Kelley had set up the shooting. Later that day, Mr. Young looked at Ms. Kelley's Facebook page and saw a photograph of the Defendant, whom he recognized as the shooter. On redirect examination, Mr. Young stated that Ms. Kelley attempted to contact him following the shooting.

A surveillance recording of the shooting was played for the jury and showed that the shooting occurred during the early evening while it was still daylight. The parking lot of the mall was filled with cars, and people were walking to and from the mall. The recording showed bystanders in the parking lot at the time of the shooting running for cover. A family that included two children was walking into the parking lot when the shooting occurred, ducked down, and ran back into the mall.

Mr. Brandon Brown's testimony at trial was consistent with Mr. Young's regarding Mr. Young's meeting Ms. Kelley at the mall, her behavior, and their encounter with the Defendant and two other men in the parking lot. Mr. Brown was unable to identify the Defendant at trial and explained that he did not have the opportunity to look at the Defendant closely at the time of the shooting. Mr. Brown was focused on one of the other men, who was also in possession of a gun. Mr. Brown stated that when he and Mr. Young got into Mr. Young's car, the second man with a gun was standing toward the front of the car on the passenger's side. A third man was near the car.

Mr. Brown testified that after Mr. Young put the car in reverse, the man who was near the passenger's side shot twice into the passenger's side. As Mr. Young backed out of the parking lot, the Defendant fired two more shots into the front of the car. The Defendant then began chasing them and shooting at them.

Ms. Kelley testified that she dated the Defendant on and off throughout high school and that they broke up when she was a junior or senior. She met Mr. Young during the summer of her freshmen year of college, and they had been "talking, dating" for one or two months prior to the shooting. She stated that she and Mr. Young obtained $4,000 after they participated in "a fraud situation with a bank account" and that they shared the proceeds.

On the day of the shooting, Ms. Kelley returned home from work to discover that the glass to her back door was broken and $2,000 in cash, which was her share of the proceeds, was missing from a shoebox in her closet. No other items were taken from her home. Ms. Kelley believed Mr. Young was involved in the burglary because he was the only one who knew about the money. She testified that she was angry and upset and that she contacted the Defendant and told him what had occurred. The Defendant told her that he would speak to Mr. Young about the money. Ms. Kelley testified that the plan was for the Defendant to approach Mr. Young and ask whether he had taken the money. Ms. Kelley maintained that she only wanted Mr. Young to admit that he did it and for him to know that she was aware that he was the perpetrator. She stated, "I never would have imagined or even wanted things to go to the point that it did."

The Defendant contacted Ms. Kelley and instructed her to pick him up at a friend's house. Ms. Kelley arrived after 5:00 p.m., and the Defendant, a man named "Rico," and another man got into Ms. Kelley's car. Ms. Kelley said the Defendant was wearing yellow pants and a black and yellow sweater. When he got into Ms. Kelley's car, she realized that he had a gun. The Defendant took the gun from his waist and put it under the seat. Ms. Kelley told the Defendant that she did not want him to use the gun and that he did not have to bring it. The Defendant assured her that he would not use it and would not take it out of the car.

Ms. Kelley testified that during this time, she was in contact with Mr. Young and that they agreed to meet at the mall so that Mr. Young could give her money for food. After picking up the Defendant and the other two men, Ms. Kelley contacted Mr. Young and told him that she was on her way to the mall. She arrived at the mall around 6:00 p.m. or 6:30 p.m. She parked in the parking lot near the entrance to the food court and entered the mall, while the three men remained in the car. She met with Mr. Brown and Mr. Young, who gave her $10. Mr. Young and Mr. Brown walked toward the exit, while Ms. Kelley walked toward the food court. She sent a text message to the Defendant that the two men were exiting the mall. Ms. Kelley stated that while walking toward the food court, she heard gunshots and "panicked." Once the gunshots ceased, she ran outside to her car.

Ms. Kelley testified that when she arrived at her car, the Defendant and the other two men were in her car, and the Defendant was sitting in the driver's seat. She said that the men were "furious" and "very frantic" and that she was angry with the Defendant because "it wasn't supposed to go that way." The Defendant asked her where Mr. Young lived, and Ms. Kelley refused to tell him, which angered the Defendant. Ms. Kelley stated that while leaving the mall, she called Mr. Young and sent him text messages asking if he was okay. She drove the Defendant and the other two men back to the home of the Defendant's friend, and she then returned home where she told her step-father what had occurred.

Ms. Kelley was subsequently arrested, and her charges were pending at the time of her testimony. On cross-examination, she testified that she had not been made any promises in exchange for her testimony and that she did not know what would occur with her charges. She said she only knew that she was required to testify truthfully.

Memphis Police Sergeant Adam Pickering with the Crime Scene Investigation Unit responded to the scene. He collected thirteen spent nine millimeter shell casings and a projectile. He noted that a Hyundai in the parking lot appeared to have been struck by bullets on the driver's side taillight. He said it appeared that several rounds were fired in a brief period of time and that the shell casings were laid out on the parking lot in a direction running east to west.

Sergeant Pickering went to another location to examine Mr. Young's car. He observed an apparent bullet strike to the hood of the car in front of the driver's seat, two apparent projectile strikes on the passenger door, a possible bullet graze on the vent window on the passenger side, and a possible bullet strike on the passenger side fender.

The jury convicted the Defendant of attempted first degree murder of Mr. Young, aggravated assault of Mr. Young through the use or display of a deadly weapon,

aggravated assault of Mr. Brown through the use or display of a deadly weapon, reckless endangerment, and employment of a firearm during the commission of or attempt to commit a dangerous felony. The trial court sentenced the Defendant to twenty-one years for attempted first degree murder, four years for each aggravated assault, two years for reckless endangerment, and six years for employing a firearm during the commission of a dangerous felony. The trial court ordered the Defendant to serve his sentences for attempted first degree murder and the firearm offense consecutively. The trial court also ordered the Defendant to serve his sentences for aggravated assault and reckless endangerment concurrently to each other but consecutively to his sentences for attempted first degree murder and the firearm offense, for an effective sentence of thirty-one years.

## ANALYSIS

### I. Sufficiency

The Defendant challenges the sufficiency of the evidence to support his convictions. The Defendant's brief on this issue consists of one page merely reciting this court's standard of review on issues of sufficiency. He does not state the convictions that he challenges, the basis for his challenge, or any argument to support his claim. Despite the deficiencies in the Defendant's brief, however, we conclude that the evidence is sufficient to support the convictions.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn.

2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

The Defendant was convicted of attempted first degree murder of Mr. Young. First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). As the trial court instructed the jury, a person attempts to commit a criminal offense who, "acting with the kind of culpability otherwise required for the offense … [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id*. Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id*. at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors tending to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; and preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id*. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). "Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation." *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013).

The Defendant also was convicted of aggravated assault of Mr. Young and Mr. Brown. As applicable to this case, a person commits aggravated assault who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury" through "the use or display of a deadly weapon." T.C.A. §§ 39-13-101(a)(2) (2014), 39-13-102(a)(1)(A)(iii) (Supp. 2015). The Defendant was convicted of reckless endangerment of those in the parking lot at the time of the shooting. As applicable to this

case, a person commits reckless endangerment who "recklessly engages in conduct that places or may place another person in imminent dangers of death or serious bodily injury" and does so with a deadly weapon. T.C.A. § 39-13-103(a), (b)(2). Finally, the Defendant was convicted of employing a firearm during the commission of or attempt to commit a dangerous felony, and the dangerous felony was attempted first degree murder. *See* T.C.A. § 39-17-1324(b), (i)(1)(A).

The evidence presented at trial, when viewed in a light most favorable to the State, established that Ms. Kelley discovered money missing from her home and believed that Mr. Young had taken it. She contacted the Defendant, who agreed to confront Mr. Young. Ms. Kelley contacted Mr. Young and arranged to meet him at a mall under the guise of obtaining money for food. She then picked up the Defendant who brought his gun and two of his friends to confront Mr. Young. After meeting Mr. Young in the mall, Ms. Kelley sent a text message to the Defendant, informing him that Mr. Young and Mr. Brown were exiting the mall.

Once Mr. Young and Mr. Brown walked outside, the Defendant and two other men approached them while armed with guns. The Defendant and the two men followed Mr. Young and Mr. Brown to Mr. Young's car. The Defendant held his gun at his side while attempting to speak to Mr. Young. When Mr. Young began driving away, the Defendant and one of the men fired numerous shots at Mr. Young and Mr. Brown. The Defendant chased after Mr. Young and Mr. Brown and continued firing at them as they drove away. The Defendant asked Ms. Kelley where Mr. Young lived, but Ms. Kelley refused to tell him. Instead, the Defendant, the two men, and Ms. Kelley fled the scene.

The shooting occurred in the parking lot of a crowded mall during the early evening hours. A video recording of the shooting showed that others were in the parking lot when the shooting occurred, and a family that included two children were seen in the video walking outside the mall, ducking in an effort to avoid the bullets, and running back into the mall. We conclude that this evidence is sufficient to support the Defendant's convictions.

## II. Lesser Included Offenses

The Defendant challenges the trial court's failure to instruct the jury on misdemeanor reckless endangerment as a lesser included offense of attempted first degree murder. The Defendant acknowledges that he did not request such an instruction at trial and that he did not raise the issue in his motion for new trial. *See* T.C.A. § 40-18-110(c) (providing that a defendant's failure to submit a written request to the trial court for an instruction on a lesser included offense results in waiver of the issue on appeal); Tenn. R. App. P. 3(e) (requiring that certain issues, including "jury instructions granted

- 8 -

or refused," be raised in a motion for new trial). However, the Defendant seeks plain error review of the issue.

When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

A person commits the misdemeanor offense of reckless endangerment who "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a), (b)(1). If a person does so while using a deadly weapon, the offense is a Class E felony. *Id.* (b)(2). This court has recognized that misdemeanor reckless endangerment is a lesser included offense of attempted first degree murder. *See State v. Frederick Edward Braxton and Leonard Cardell Harris*, No. M2009-01735-CCA-R3-CD, 2011 WL 3809773, at *18 (Tenn. Crim. App. Aug. 26, 2011); *State v. David Lee Heakin*, No. M2008-01834-CCA-R3-CD, 2010 WL 532863, at *8 (Tenn. Crim. App. Feb. 16, 2010).

To establish that the trial court's failure to instruct the jury on a lesser included offense resulted is plain error, the Defendant must show "a reasonable probability that 'a reasonable jury would have convicted the defendant of the lesser-included offense instead of the charged offense.'" *Martin*, 505 S.W.3d at 505 (quoting *State v. Richmond*, 90 S.W.3d 648, 662 (Tenn. 2002)). Our supreme court has held that:

where the jury convicts the defendant of a greater charged offense rather than an immediately lesser offense standing between omitted lesser-included offenses and the offense for which the defendant was convicted, any error from the omission of jury instructions on these other asserted lesser-included offenses is harmless beyond a reasonable doubt because the jury, by finding the defendant guilty of the greater offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses.

*Moore v. State*, 485 S.W.3d 411, 421-22 (Tenn. 2016) (citing *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998)). "[T]he term 'immediately lesser offense' does not encompass facilitation of the charged offense." *Id.* at 422 n.4.

The trial court instructed the jury on facilitation of attempted first degree murder, attempted second degree murder, facilitation of attempted second degree murder, attempted voluntary manslaughter, and facilitation of attempted voluntary manslaughter as lesser included offenses of attempted first degree murder. Had misdemeanor reckless endangerment been included in the jury charge, it would have been listed after attempted voluntary manslaughter. The jury convicted the Defendant of attempted first degree murder to the exclusion of the immediate lesser offenses of attempted second degree murder and attempted voluntary manslaughter. The Defendant has failed to show a reasonable probability that a reasonable jury would have convicted him of misdemeanor reckless endangerment rather than attempted first degree murder had the trial court provided such a jury instruction. Thus, the Defendant has failed to establish plain error.

## III. Sentencing

The Defendant challenges the trial court's imposition of partial consecutive sentences. The only proof presented during the sentencing hearing was the presentence report, which is not included in the appellate record. The trial court found that the Defendant was a Range I offender. The trial court applied an enhancement factor based upon the Defendant's criminal history, giving significant weight to a prior aggravated robbery conviction. *See* T.C.A. § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range."). The trial court also applied as enhancement factors that the offenses involved more than one victim and that the Defendant "had no hesitation about committing a crime when the risk to human life was high." T.C.A. § 40-35-114(3), (10). The trial court described the circumstances of the offenses as "horrifying" and noted that the mall was "busy" at the time of the shooting. The trial court further noted that the video recording of the shooting showed "crowds of people with children who were diving out of the way."

The trial court sentenced the Defendant to twenty-one years for attempted first degree murder, four years for each aggravated assault, two years for reckless endangerment, and six years for employing a firearm during the commission of a dangerous felony. The trial court ordered the Defendant to serve his sentences for attempted first degree murder and the firearm offense consecutively. The trial court also ordered the Defendant to serve his sentences for aggravated assault and reckless endangerment concurrently to each other but consecutively to his sentences for attempted first degree murder and the firearm offense, for an effective sentence of thirty-one years.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The decision to impose consecutive sentences rests within the sound discretion of the trial court. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). The standard of review for consecutive sentencing is abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Although the Defendant contends on appeal that the trial court erred in imposing partial consecutive sentences, he failed to identify in his brief how the trial court erred or to offer any argument to support his claim of error. Rather, the Defendant merely states the standard of review and includes a block quotation from this court's opinion in *State v. Biggs*, in which this court held that the trial court erred in imposing partial consecutive sentences because the sentence was not "'justly deserved in relation to the seriousness of the offense'" and was not the "'least severe measure necessary to achieve the purposes for which the sentence is imposed.'" 482 S.W.3d 923, 927 (Tenn. Crim. App. 2015) (quoting T.C.A. §§ 40-35-102, -103).

We note that consecutive sentencing for the firearm charge and the underlying felony of attempted first degree murder was mandatory. *See* T.C.A. § 39-17-1324(e)(1). The trial court ordered the Defendant to serve his sentences for aggravated assault and

reckless endangerment concurrently to each other but consecutively to his sentences for attempted first degree murder and the firearm offense upon finding that the Defendant "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). The Defendant does not challenge this finding on appeal. Furthermore, the trial court relied upon the Defendant's presentence report and his criminal history as stated in the presentence report in imposing partial consecutive sentences. However, the presentence report is not included in the appellate record. The Defendant, as the appellant, has the burden of assuring that the appellate record includes "a full, accurate, and complete account of what transpired with respect to those issues that are the bases of appeal." *See* Tenn. R. App. P. 24(a). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); *see State v. Scott Edward Robins*, No. M2014-02372-CCA-R3-CD, 2015 WL 6437208, at \*2 (Tenn. Crim. App. Oct. 23, 2015) (stating that "[o]rdinarily, the presentence report is a necessary part of this court's review without which we must presume that the sentences imposed are correct"); *State v. Gregory Lynn Hill*, No. E2008-02521-CCA-R3-CD, 2009 WL 3711993, at \*12 (Tenn. Crim. App. Nov. 6, 2009) (holding that due to the absence of the presentence report from the appellate record, this court must presume that the trial court's rulings regarding the defendant's sentence was supported by sufficient evidence). Accordingly, the Defendant has failed to establish that he is entitled to relief on this issue.

## CONCLUSION

Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE